IN THE DISTRICT COURT OF GUAM

FOR THE TERRITORY OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL CASE NO. 08-00018 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| ERNESTO PAGLICAWAN VERDERA | ) | **Granting Motion to Sever** |
| and MARK ANTHONY BARTOLOME, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on a Motion to Sever filed by defendant Ernesto Paglicawan Verdera.  <u>See</u> Docket No. 29.  The most recent hearing held on the matter was on June 25, 2008. Assistant United States Attorney Marivic P. David appeared on behalf of the United States (the "Government").  Appearing for Verdera was attorney F. Randall Cunliffe, and attorney William Gavras appeared on behalf of defendant Mark Anthony Bartolome.[1]  At the conclusion of the hearing, the Court took the motions under advisement.  Upon consideration of the record, argument of counsel, and relevant rules and case law, the Court hereby GRANTS the motion to sever and sets forth the bases for its decision herein.

///

///

---

[1]  Verdera and Bartolome will be collectively referred to as the Defendants.

## BACKGROUND

On February 28, 2008, a Complaint was filed charging the Defendants with the offense of Bulk Cash Smuggling Out of the United States, in violation of 31 U.S.C. § 5332. See Docket No. 1. Additionally, the Complaint contained a Forfeiture Allegation which sought the surrender of approximately $900,000 in U.S. currency involved in the offense.

On March 5, 2008, an Indictment was issued by the grand jury charging the Defendants with the same offense contained in the Complaint. See Docket No. 13.

On April 22, 2008, Verdera filed the instant motion requesting that his trial be severed from that of Bartolome. See Docket No. 29. Verdera argued that Bartolome's oral statements, which the Government intended to introduce at the trial through the agent who interviewed Bartolome, would prejudice him since he would not be able to confront and cross-examine the non-testifying codefendant. Thus, Verdera contended that severance was appropriate and necessary pursuant to Bruton v. United States, 391 U.S. 123 (1968).[2]

On May 1, 2008, a Superseding Indictment was returned by the grand jury charging both Defendants with Conspiracy to Smuggle Bulk Cash Out of the United States (Count I), Bulk Cash Smuggling Out of the United States (Count II), and Forfeiture Allegation (Count III). See Docket No. 34. Only Bartolome was charged in Count IV with Importation of Methamphetamine Hydrochloride.

On April 28, 2008, the Government filed its opposition to the motion. See Docket No. 31. Therein, the Government argued that severance was not required since the Government would redact any statement of Bartolome that facially incriminated the Defendant, and, when combined with a limiting instruction to be given by the court, would sufficiently protect Verdera's Sixth

---

[2] In Bruton, two defendants were accused of participating in the same crime and were tried jointly. One of the defendants had confessed, and said confession named and incriminated the other defendant. The trial judge gave a limiting instruction, telling the jury that it should consider the confession as evidence only against the codefendant who had confessed and not against the defendant named in the confession. The Supreme Court held that despite the limiting instruction, the defendant was deprived of his Sixth Amendment right of confrontation, and that the Constitution forbade the use of such confessions in joint trials.

Amendment right of confrontation.

On May 5, 2008, Verdera filed his reply brief.  See Docket No. 44.  In addition to the Bruton issue, Verdera argued that the inclusion of the new charge of importation of methamphetamine hydrochloride in the Superseding Indictment against Bartolome was improper.  He also asserted that the evidence to be introduced as a result of said charge would spill over to him and significantly prejudice him in the jury's eyes, thus warranting a severance.

On May 9, 2008, the court heard oral argument on the motion.  Bartolome had neither joined the motion to sever nor filed an opposition thereto.  Accordingly, his counsel William Gavras did not appear at said hearing.  As an initial matter, the Government and Verdera agreed that the court should treat the motion to sever as if it applied to the Superseding Indictment, rather than requiring Verdera to re-file the exact same motion.  The court agreed to do so in the interests of judicial economy.  After some argument was presented, the court continued the matter briefly to permit the Government to file a supplemental memorandum addressing Verdera's second argument regarding the spillover effect of Count IV.  Additionally, the court wanted to afford the Government and Verdera an opportunity to meet and discuss possible redaction of Bartolome's statements.

On May 23, 2008, the Government filed its Supplemental Response (Docket No. 46) and Proposed Redactions to Bartolome's statements (Exhibit A thereto).   On May 30, 2008, Verdera filed a reply brief to the Government's response.  See Docket No. 51.

On June 6, 2008, the parties again appeared before the court.  At the court's request, Mr. Gavras also attended the hearing on behalf of Bartolome.  The court stated it was concerned that the redactions proposed by the Government and Verdera might interfere with Mr. Gavras's defense of Bartolome, specifically Bartolome's ability to cross examine the agent about the statements allegedly made by him.  At counsel's request, the court continued the matter yet again to permit Bartolome to file a brief on the matter and to permit the Government to file a memo in response thereto.

On June 16, 2008, Bartolome filed an objection to the Government's proposed redactions. See Docket No. 54.  On June 23, 2008, the Government filed a response to Bartolome's

1    objection.  See Docket No. 59.

2         The court heard final argument from the parties on June 25, 2008, and took the motion

3    under advisement.

4                                              **ANALYSIS**

5         Verdera's motion to sever is based on two theories: (1) severance is necessary under

6    Bruton and its progeny in order to protect the Defendant's Sixth Amendment right of

7    confrontation; and (2) Count IV is improperly joined with the other charges, and its inclusion

8    would unnecessarily prejudice him because the spillover effect from evidence to be presented

9    against Bartolome would equally taint Verdera in the eyes of the jury.  These issues are

10   addressed separately below.

11   **I.    Whether Joinder of Count IV was Proper**

12        The first matter the court will address is whether Count IV, which charges only Bartolome

13   with Importation of Methamphetamine Hydrochloride, is appropriately joined with the other

14   offenses alleged in the Superseding Indictment.  Accordingly, the court begins its analysis with

15   Rule 8 of the Federal Rules of Criminal Procedure.

16        The indictment or information may charge a defendant in separate counts with 2 or
          more offenses **if the offenses charged** – whether felonies or imports or both – **are**
17        **of the same of similar character, or are based on the same act or transaction,**
          **or are connected with or constitute parts of a common scheme or plan**.

18

19   Fed. R. Crim. P. 8(a) (emphasis added).  Thus, Rule 8(a) requires that Count  IV and the bulk

20   cash smuggling offenses be "of the same or similar character, or . . based on the same act or

21   transaction, or are connected with or constitute parts of a common scheme or plan" in order for

22   joinder of the offenses to be proper.

23        In this case, the offenses are not of the same or similar character.  Based on Ninth Circuit

24   Model Criminal Jury Instruction 8.16, the elements for Count I (Conspiracy to Smuggle Bulk

25   Cash Out of the United States) are as follows:

26        1.        Beginning on or about October 27, 2008, and ending on or about February 28,
                    2008, there was an agreement between two or more persons to commit the offense
27                  of Bulk Cash Smuggling Out of the United States,

28   ///

2.      The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it, and

3.      One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with the jury unanimously agreeing as to the particular overt act that was committed.

The elements for Count II (Bulk Cash Smuggling Out of the United States) are:

1.      The defendant knowingly concealed more than $10,000 in currency on his person in any conveyance, article of luggage, merchandise, or other container,

2.      The defendant knowingly attempted to transport such currency from a place within the United States to a place outside the United States,

3.      The defendant knew at the time of the alleged concealment he or she was required to file a report of the amount of money she was attempting to transport with the Secretary of Treasury, and

4.      The defendant intended to evade filing such a report.

See U.S. v. Tatoyan, 474 F.3d 1174, 1180 n.7 (9th Cir. 2007).

In contrast, based on Ninth Circuit Model Criminal Jury Instruction 9.27, the elements for Count IV (Importation of Methamphetamine Hydrochloride) are as follows:

1.      The defendant knowingly brought methamphetamine hydrochloride into the United States, and

2.      The defendant knew that it was methamphetamine hydrochloride or some other prohibited drug.

A comparison of the essential elements of the offenses as set forth above reveals that Count IV is not of the same or similar character as Counts I or II. Counts I and II essentially involve the smuggling of and agreement to smuggle large sums of cash out of the United States, whereas Count IV deals with bringing controlled substances into the United States. Thus, these offenses are not of the same or even similar character.

The next question then is whether the offenses are based on the same act or transaction. The court answers this question in the negative. Again, Counts I and II involve the taking or bulk cash *out* of the United States, while Count IV involves the bringing of methamphetamine hydrochloride *into* the United States. These are separate and distinct acts. The smuggling of cash out of the United States is alleged to have occurred on February 28, 2008, when the Defendants attempted to leave Guam, while the importation of methamphetamine hydrochloride

1  as alleged in Count IV occurred when Bartolome entered the United States sometime between

2  January 27, 2008, and February 28, 2008. While evidence to support Count IV may have been

3  discovered after law enforcement authorities discovered the bulk cash concealed in the

4  Defendants' checked baggage, this tenuous connection between the offenses falls far short of

5  Rule 8(a)'s requirement that the offenses be based on the same act or transaction.

6       Finally, Count IV may be joined with the other offenses if it is part of a common scheme

7  or plan. The Government has failed to meet this showing. There has been no evidence produced

8  which links the large sums of cash to any drug activity. The only evidence the Government has

9  produced is Bartolome's statement that he traveled to Guam separately from Verdera, and he

10 brought the methamphetamine hydrochloride with him to Guam for his own personal use. The

11 Government has failed to link the offenses to a mutual plan of action or strategy. Based on the

12 evidence adduced thus far, the court can not conclude that the offenses are part of a common

13 scheme or plan.

14       Accordingly, the court agrees with Verdera and finds the joinder of Count IV in the

15 Superseding Indictment to be improper and prejudicial to the Defendants. While an appropriate

16 limiting instruction may cure any prejudice Bartolome may experience, the same can not be said

17 about Verdera, who is not charged in Count IV. The jury may not be able to limit its

18 consideration of the drug evidence to Bartolome only, and may lead the jury to conclude that the

19 bulk cash is somehow related to drug activity when in fact the only evidence the Government has

20 been able to present to the court shows no such connection. As a result, the trial of Count IV

21 must necessarily be severed from the trial of Counts I through III. See Fed. R. Crim. P. 14(a).

22 **II.    The _Bruton_ Rule and the Right to Confrontation**

23       Rule 8 of the Federal Rules of Criminal Procedure permits joinder of defendants in the

24 same indictment to promote judicial economy.

25       The indictment or information may charge 2 or more defendants if they are alleged
         to have participated in the same act or transaction, or in the same series of acts or
26       transactions, constituting an offense or offenses. The defendants may be charged in
         one or more counts together or separately. All defendants need not be charged in
27       each count.

28 Fed. R. Crim. P. 8(b). "There is a preference in the federal system for joint trials of defendants

1  who are indicted together.  Joint trials 'play a vital role in the criminal justice system.'  They

2  promote efficiency and serve the interests of justice by avoiding the scandal and inequity of

3  inconsistent verdicts."  Zafiro v. United States, 506 U.S. 534, 537 (1993) (*quoting* Richardson v.

4  Marsh, 481 U.S. 200, 209-210 (1987)).

5      Nevertheless, a trial judge has broad discretion to grant or deny severance of joined counts

6  or defendants after balancing the interest in judicial economy against the risk of prejudice to the

7  defendant or the Government.  Rule 14 of the Federal Rules of Criminal Procedure provides for

8  relief from prejudicial joinder and states that "[i]f the joinder of offenses or defendants in an

9  indictment, an information, or a consolidation for trial appears to prejudice a defendant or the

10  government, the court may order separate trials of counts, sever the defendants' trials, or provide

11  any other relief that justice requires."  Fed. R. Crim. P. 14(a).

12      The moving party must show more than that a separate trial would have given him a
better chance for acquittal. He must also show violation of one of his substantive

13  rights by reason of the joint trial: unavailability of full cross-examination, lack of
opportunity to present an individual defense, denial of Sixth Amendment

14  confrontation rights, lack of separate counsel among defendants with conflicting
interests, or failure properly to instruct the jury on the admissibility of evidence as

15  to each defendant. In other words, the prejudice must have been of such magnitude
that the defendant was denied a fair trial.

16

17  United States v. Douglass, 780 F.2d 1472, 1478 (9th Cir. 1986) (*quoting* United States v.

18  Escalante, 637 F.2d 1197, 1201 (9th Cir. 1980), *cert. denied,* 449 U.S. 856 (1980)).

19      In this case, Verdera argues that severance is warranted because the Government intends

20  to elicit Bartolome's oral statements through its agent who conducted Bartolome's interview.

21  Verdera asserts that unless Bartolome takes the stand so that Bartolome can be cross-examined

22  about certain incriminating statements made against him, he will be deprived of his Sixth

23  Amendment right of confrontation.  In order to avoid Bruton issues, the Government proposes to

24  redact any of Bartolome's statements that *facially* incriminate Verdera.  See Government's

25  Proposed Redactions.  Unfortunately, Verdera does not believe the redactions as proposed by the

26  Government will cure the Bruton issues presented.  Furthermore, Bartolome argues the

27  Government's proposed redactions would unreasonably curtail his ability to defend himself

28  because he would be limited in his opportunity to cross examine the Government's agent.

1    While some of the Government's proposed redactions are acceptable, the court finds

2    other proposed redactions to be problematic.  For instance, the Government intends to offer

3    Statements 11-A through D,[3] which in essence establish the nature of the relationship between

4    the Defendants and their history of traveling together.  The court concurs with the Government

5    that no redactions to these statements are necessary since the statements are not incriminating.

6    Additionally, the government agent can testify as to the Defendants' travel history since said

7    facts are independently ascertainable through the stamps in Verdera and Bartolome's passports

8    and through business records at Days Inn and the rental car agency.

9    The problem arises with statements such as Statement 11-G[4] and 11-H.[5]  The

10   Government's proposed redactions to these statements are as follows, with additions to the

11   original statements noted in italics:

---

[3] In summary, these statements reveal that on February 28, 2008, Bartolome and Verdera went to the airport together.  Bartolome dropped Verdera at curbside and then went to return their rental car.  Bartolome and Verdera proceeded to check in at Philippine Airlines counter. While waiting at the gate to board, Bartolome and Verdera were approached by uniformed personnel and escorted to TSA screening area.  Thereafter, other uniformed personnel arrived and escorted Bartolome and Verdera to Guam Customs inspection area.

Additionally, Bartolome has known Verdera for seven years, often referring to him "Kuya," which means "brother" in the Tagalog language.  Bartolome has been to Guam a total of three times.  All three trips were with Verdera.  On their third and most recent trip, Bartolome arrived in Guam from Manila on January 28 or 29, 2008.  Verdera arrived in Guam two to three days later to meet Bartolome, and they shared a rental car and room at Days Inn in Tamuning.

[4] Currently, Statement 11-G is as follows:  Bartolome helped Verdera count and bundle the money in denominations of 10, 20, and 100 bills.  Bartolome helped to transport the money from Guam to Manila, Philippines on their second and third trip to Guam.  Verdera bought the poster board paper and prepared the flooring of the luggage.  Throughout their stay, Bartolome witnessed Verdera packing money under the false flooring of the luggage.

[5]Statement 11-H is as follows:  Bartolome stated the money belongs to Verdera. Bartolome does not know from whom Verdera obtained the money while in Guam.  Bartolome believes the source of the money is drugs but he is not certain.  Bartolome knew there was over $10,000.00 in the bags and that the money had to be reported.  Bartolome is on Guam to help Verdera transport the money.  Bartolome has been paid $6000.00 to $7000.00 for helping Verdera smuggle bulk cash from Guam to Manila, Philippines.  Bartolome raised a concern to Verdera that authorities would catch them smuggling money if the money was concealed in checked baggage as opposed to hand-carrying the money.  Verdera told Bartolome they would not get caught.

Bartolome helped ~~Verdera~~ *another person* count and bundle the money in denominations of 10, 20, and 100 bills. Bartolome helped to transport the money from Guam to Manila, Philippines on their second and third trip to Guam. ~~Verdera~~ *Another person* bought the poster board paper and prepared the flooring of the luggage. Throughout their stay, Bartolome witnessed ~~Verdera~~ *another person* packing money under the false flooring of the luggage.

Bartolome stated the money belongs to ~~Verdera~~ *another person.* Bartolome does not know from whom ~~Verdera~~ *the other person* obtained the money while in Guam. Bartolome believes the source of the money is drugs but he is not certain. Bartolome knew there was over $10,000.00 in the bags and that the money had to be reported. Bartolome is on Guam to help ~~Verdera~~ *the other person* transport the money. Bartolome has been paid $6000.00 to $7000.00 for helping ~~Verdera~~ *the other person* smuggle bulk cash from Guam to Manila, Philippines. Bartolome raised a concern to ~~Verdera~~ *the other person* that authorities would catch them smuggling money if the money was concealed in checked baggage as opposed to hand-carrying the money. ~~Verdera~~ *The other person* told Bartolome they would not get caught.

The Government's proposed redactions are insufficient to avoid the <u>Bruton</u> problems as argued by Verdera. After the <u>Bruton</u> decision, the Supreme Court in <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987) held that admission of a non-testifying codefendant's confession with a proper limiting instruction did not violate the Confrontation Clause where the confession in that case was redacted to eliminate not only the defendant's name, but any reference to her existence. <u>Id.</u> at 211. In a footnote, the Supreme Court stated: "We express no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or a neutral pronoun."<u>Id.</u> at 211 n. 5

After <u>Richardson</u>, the Ninth Circuit held that redacting a confession by replacing the defendant's name with a neutral pronoun did not violate <u>Bruton</u>. <u>See</u> <u>United States v. Enriquez-Estrada</u>, 999 F.2d 1355 (9th Cir.1993). The Ninth Circuit stated

the admission in a joint trial of a codefendant's confession that is redacted to substitute a neutral pronoun or other general word for the name of the complaining defendant does not violate <u>Bruton</u> so long as the confession does not compel a direct implication of the complaining defendant.

<u>Id.</u> at 1359 (quoting <u>United States v. Vasquez</u>, 874 F.2d 1515, 1518 (11th Cir.1989)).

In <u>Enriquez-Estrada</u>, the codefendant's statements were redacted and the term "individuals" substituted for the name of the other two codefendants. The redaction read that "individuals," not Jorge and Donald, were at a house under police surveillance "taking care of

1    marijuana." Id.

2        The Supreme Court had the opportunity to address the Bruton issue with regard to

3    redacted statements in Gray v. Maryland, 523 U.S. 185 (1998), where it held that redactions that

4    replace a name with an obvious blank space, a word such as "deleted," or a symbol or other

5    obvious indication of alteration so closely resemble Bruton's unredacted statements as to warrant

6    the same legal results. 523 U.S. at 195. The Supreme Court reasoned that a jury will often

7    realize that such a redacted confession refers specifically to the defendant, and an obvious

8    deletion may call the jurors' attention specifically to the removed name and encourage

9    speculation about the reference. Id. at 193. The Supreme Court, however, did note that

10   *redactions which do not lead to the inference that a specific person was named and the identity*

11   *of that person protected through redaction may be appropriate*. For example, in Gray, the

12   question was "Who was in the group that beat Stacey?" The inappropriate redacted answer was

13   read as: "Me, deleted, deleted, and a few other guys." An appropriate redaction, the Supreme

14   Court suggested, would have been: "Me and a few other guys." Id. at 196. Thus, Gray clarifies

15   that the substitution of a neutral pronoun or symbol in place of the defendant's name is not

16   permissible if it is obvious that an alteration has occurred to protect the identity of a specific

17   person.

18        In this case, substitution of the neutral phrase "another person" in place of Verdera's

19   name is not sufficient because it still leads to the inference that this other person was Verdera.

20   Even if the court were to give limiting instructions to the jury and order the agent to not name

21   Verdera or otherwise specifically identify him, it would be evident from the context of the

22   statements that Verdera was this "other person." No other person has been identified in any of

23   the previous paragraphs, and no one else is named in the Superseding Indictment. Thus, based

24   on the statements of Bartolome taken as a whole, no other reasonable inference can be made

25   except that "another person" refers to Verdera. Pursuant to Marsh, Enrique-Estrada, and Gray, a

26   neutral pronoun can not be appropriately substituted for Verdera's name, and all reference to

27   Verdera's existence must be removed from Statements 11-G and H.

28        If Statement 11-G is redacted to remove all reference to the existence of Verdera or

1    "another person" with regard to the smuggling and packaging of cash, an appropriate redaction

2    to satisfy <u>Bruton</u> and its progeny may be in the following form:

3       Bartolome ~~helped Verdera~~ count*ed* and bundl*ed* the money in denominations of
        10, 20, and 100 bills.  Bartolome ~~helped to~~ transport*ed* the money from Guam to
4       Manila, Philippines on ~~their~~ *the* second *trip* and *attempted to do so on* the third
        trip to Guam.  ~~Verdera bought the poster board paper and prepared the flooring of~~
5       ~~the luggage.  Throughout their stay, Bartolome witnessed Verdera packing money~~
        ~~under the false flooring of the luggage.~~

6

7       Similarly, Statement 11-H can also be redacted as follows:

8       Bartolome stated the money ~~belongs to Verdera~~ *does not belong to him*.
        Bartolome does not know ~~from whom Verdera~~ *how* ~~obtained~~ the money *was*
9       *obtained* while in Guam.  Bartolome believes the source of the money is drugs but
        he is not certain.  Bartolome knew there was over $10,000.00 in the bags and that
10      the money had to be reported.  Bartolome is on Guam to ~~help Verdera~~ transport
        the money.  Bartolome has been paid $6000.00 to $7000.00 for ~~helping Verdera~~
11      ~~smuggle~~ *smuggling* bulk cash from Guam to Manila, Philippines.  Bartolome *was*
        ~~raised a~~ concern*ed* ~~to Verdera~~ that authorities would catch ~~them~~ *him* smuggling
12      money if the money was concealed in checked baggage as opposed to hand-
        carrying the money.  ~~Verdera told Bartolome they would not get caught.~~

13

14       While the above redactions may be acceptable to the Government and Verdera, Bartolome

15   argues that such redactions distort the true essence of his statements.  Furthermore, Bartolome

16   asserts that such redactions would interfere with cross examination to such an extent that

17   Bartolome's Sixth Amendment Right to confrontation as well as his general right to an effective

18   cross examination will be violated.  This is because Bartolome's trial strategy would be to argue

19   that the government agent simply got it wrong – that the agent's recollection of the oral

20   interview was inaccurate.  Bartolome contends that because he and Verdera have a close

21   relationship and frequently travel together, when Bartolome made inculpatory statements about

22   Verdera the agent assumed that Bartolome himself was also involved in the illegal activity.

23       The Government cites to the case of <u>United States v. Castro</u>, 813 F.2d 571 (2d Cir. 1987)

24   for the proposition that a <u>Bruton</u> modification is permissible even if it is somewhat misleading

25   and limits a defendant's ability to fully cross examine a witness.  In <u>Castro</u>, two defendants

26   (Castro and Acosta) were convicted of conspiracy to manufacture and possess cocaine with

27   intent to distribute.  Prior to their arrest the police were executing a search warrant for

28   contraband when they came across Castro and eventually arrested him when he assaulted a DEA

1   agent.  Id. at 574.  Following his arrest, another agent asked Castro if he knew where the cocaine

2   was kept.  Id.  Castro pointed to the location of the cocaine and stated that it was at the bottom of

3   a black plastic bag.  Id.  When asked how he knew the cocaine was in the bag, Castro said that

4   the bag belonged to Acosta, who had put it there.  Id.  Acosta moved for a severance based on

5   Bruton.  Id. at 575.  The government agreed to redact any oral statement by Castro which

6   inculpated Acosta, but Castro then moved for severance, arguing "that omission of the part

7   which attributed ownership of the cocaine to Acosta would make Castro's act of pointing and his

8   statement appear to be a pure admission of ownership of the cocaine."  Id.  The trial court denied

9   both motions to sever and ruled that no part of the statement with respect to Acosta could be

10  elicited from the agent.  Id.  During direct examination, the government asked the agent whether

11  Castro said the white powdered substance was his, and the agent replied "[i]n substance, he

12  denied it."  Id.  During cross examination, Castro's counsel attempted to further clarify Castro's

13  statement to the agent, but Acosta's counsel objected.  Id.  The court then asked the agent, "[t]he

14  fact is that he never said it was his cocaine, is that correct?"  Id.  The agent stated, "[i]n

15  substance, that's what he stated."  Id.

        On appeal, the Second Circuit Court of Appeals recognized that

            Castro's conduct and statement was changed somewhat by not allowing the jury to
            know that Castro had stated that the cocaine belonged to Acosta.  Presumably, his
            implied denial of ownership at trial would seem somewhat more plausible if his
            conduct and statement . . . were accompanied by a simultaneous attribution of
            ownership to another person.

20  Id. at 576.  The appellate court eventually ruled that the trial court's actions were not an abuse of

21  discretion, reasoning that the trial court was faced with competing interests and had to balance

22  Castro's interest in having his statement presented in context against the court's obligation to

23  protect Acosta's interests under Bruton and the interests of judicial economy.  Id.

24      While the trial court in Castro may not have committed an error which required reversal,

25  the facts of this case are much different than in Castro.  Castro dealt with the redaction of a

26  single statement which inculpated a codefendant.  Here, the court is faced with having to redact

27  numerous statements.  Statements 11-G and H, as provided above, are but two of the many

28  statements which require redaction.  These redacted or modified statements account for

1   approximately one-third of the statements made by Bartolome.  The court is concerned that the

2   large number of redactions will provide an incomplete account of Bartolome's statements and his

3   role in the offense.  More specifically, in Statement 11-G, instead of the jury being told that

4   Bartolome said he *helped* Verdera count and bundle the money, and *helped* Verdera transport the

5   money, the redacted version of said statement gives the impression that Bartolome *alone* counted

6   and bundled the money, that Bartolome *alone* transported the money to Manila.  This is clearly

7   misleading and mischaracterizes Bartolome's role as contained in the statements made during his

8   oral interview.  This high ratio of redacted to unredacted statements will limit Bartolome's

9   ability to vigorously cross examine the agent and thereafter argue that the agent's recollection of

10  the interview is inaccurate.  Bartolome's counsel will be much more restricted than that of

11  counsel in <u>Castro</u>.

12      Based on counsel's statements, the court believes Bartolome's defense strategy will be to

13  argue that his relationship with Verdera is akin to the close relationship between brothers or

14  father and son.  Because of this relationship, Bartolome agreed to do certain innocuous or

15  innocent acts for Verdera, not realizing that these harmless favors would have such devastating

16  consequences.  Verdera paid for Bartolome's trips to Guam and gave him spending money.

17  Verdera may have initially believed these trips were going to be a vacation, but then Verdera –

18  his "Kuya" or father-figure – asks Bartolome for his help, and Bartolome obliges.  The core of

19  Bartolome's defense in denying he committed culpable conduct is to accuse Verdera of this

20  scheme.  Thus, Bartolome's proposed defense is sufficiently mutually exclusive and antagonistic

21  to that of Verdera so as to warrant severance of their trials.  <u>See</u> <u>United States v. Troiano</u>, 426 F.

22  Supp.2d 1129, 1135 (D. Haw. 2006).[6]

23  _____

24      [6] In <u>Troiano</u>, the court held that defendants' defenses are sufficiently antagonistic to
    warrant severance.  In that case, the government intended to show defendant Toki conspired to
25  rob a liquor store by providing detailed information regarding the store layout and store safe to
    defendant Troiano.
26

27      Toki's preferred defense was that Troiano was a "predator" who bullied or
    manipulated him into providing this information.  Troiano's anticipated defense is
28      that he did not commit the robbery. . . .  By claiming that Troiano deceived or

1    The problematic nature resulting from redactions as discussed above when combined with

2    Bartolome's antagonistic defense weighs strongly in favor of severance of the Defendants' trials

3    in order to safeguard both Defendants' right to a fair trial.  In balancing these competing

4    interests, the court finds that the Defendants' rights far outweigh the preference for a joint trial in

5    order to promote judicial efficiency.  Given the circumstances presented by this case, severance

6    is the only appropriate remedy.

7                                                        **CONCLUSION**

8    For the reasons set forth above, Verdera's Motion to Sever is granted.  The parties shall

9    appear before the court on July 22, 2008, at 10:00 a.m. to discuss trial dates for the Defendants.

10   The Government shall come prepared to advise the court which defendant will proceed to trial

11   first.

12   IT IS SO ORDERED.



13                                                        **/s/ Joaquin V.E. Manibusan, Jr.**
                                                         **U.S. Magistrate Judge**
14                                                       **Dated: Jul 02, 2008**

15

16

17   **Failure to file written objections to this Order within ten (10) days from the**
     **date of its service shall bar an aggrieved party from attacking such Order**
18   **before the assigned United States District Judge.  28 U.S.C. § 636(b)(1)(B).**

19

20

21

22

23

24

25

26   forced him into providing information . . ., Toki is, in essence, saying that Troiano
     is responsible and the jury should convict Troiano, and not him, for the robbery.
27   In other words, in denying culpable involvement, Toki is accusing Troiano.

28   Id.